**UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation, Appellant,**

v.

**STEWART'S DOWNTOWN MOTORS et al., Appellees.**

**No. 18891.**

United States Court of Appeals
Ninth Circuit.

Sept. 9, 1964.

Robert H. Green, Moore, Romley, Kaplan, Robbins & Green, Phoenix, Ariz., for appellant.

Newman R. Porter, Evans, Kitchel & Jenckes, Phoenix, Ariz., for appellees.

Before JERTBERG and DUNIWAY, Circuit Judges, and JAMESON, District Judge.

DUNIWAY, Circuit Judge.

United States Fidelity and Guaranty Company (Fidelity) appeals from an adverse judgment in an action for declaratory relief. Jurisdiction is based upon diversity of citizenship. We are affirming. We state the facts, as found by the court.

On September 21, 1961, but under date of September 5, 1961, and effective for one year beginning August 22, 1961, there was delivered to appellees, Stewart's Downtown Motors and others (the insured), a comprehensive general automobile liability policy. The insured are eighteen individuals and corporations engaged in the business of automobile dealers, and other businesses, and they owned or possessed between sixty and one hundred automobiles at any one time. The policy was issued by Fidelity, but obtained through Copperstate Insurance Agency of Phoenix, Arizona. Fidelity is a Maryland corporation, having its principal office in Baltimore. Although it has an office in Arizona, it does not do business directly with the public, but requires that the person seeking to obtain insurance obtain it through one of its agents. Copperstate is such an agent. It is characterized by Fidelity as an independent insurance agent. It is an Arizona corporation of which one Douglas was president and one Smith vice president. Copperstate had a written agreement with Fidelity, entitled "Agency Agreement," which authorized it, as Fidelity's agent, to issue, among other things, "binders which the company (Fidelity) may, from time to time, authorize to be issued and delivered." It was Copperstate's practice to issue such binders before notifying Fidelity that it had done so.

During the interval between August 22, 1961, the effective date of the policy, and September 21, 1961, the date the policy was delivered, the insured had nothing from Fidelity or Copperstate in writing. The insurance was made effective by an oral "binder," a statement of Douglas, president of Copperstate, that coverage existed. When delivered, the policy was countersigned by Douglas as Fidelity's "duly authorized representative." The insured had no contact whatever with Fidelity; they dealt entirely through and with Copperstate.

The estimated premium for the policy, subject to adjustment at the end of the year depending upon changes in the status of the various named insured, was $10,151.69, and Copperstate rendered to the insured a printed form, headed "INVOICE". It would appear to be a form furnished to agents by the Del Mar Company. The paper had Copperstate's name typed at the top. It contains a columnar series of blanks in which the policy is identified, and a tabulation, in appropriate blanks, showing the gross premiums, a down payment of $2,030.34, a service charge of $168.82, and an "amount of

note" of $8,290.17. There is also a form for designating a "plan," monthly, equal, or annual. "Monthly" is checked. The next portion of the document is headed "NOTICE TO ASSURED," and says: "For your convenience, you may budget the premium on the policies in installments, as shown in the Summary on the left hereof. If you desire to avail yourself of this method of payment, please sign below and return this Invoice and Note to us."

Immediately below the "NOTICE TO ASSURED" is a portion of the document headed "NOTE," to be executed by the insured. It is addressed to "you," presumably Copperstate, recites a desire to budget the balance of the premium, and continues "in consideration of your advancing the same on behalf of the undersigned, the undersigned agrees to pay to your order the sum shown in. the Summary hereof as Amount of Note payable in installments in the amounts and on the dates specified therein." There is a further paragraph whereby, to secure payment, the signer assigns to "you" all moneys due or to become due to the signer under the policy. There follows this language: "* * * the undersigned irrevocably constitutes you the attorney of the undersigned to receive and receipt, enter satisfaction of any judgment, and endorse the name of the undersigned to any check or draft, for all moneys due or that may become due the undersigned as aforesaid, and to apply the same to the payment of this note and return any excess such moneys to the undersigned."

A third paragraph states "On default of any payment due hereunder" or in the event of (1) bankruptcy or insolvency of "the undersigned," or (2) any loss payment under the policy, or (3) cancellation by the insurer, or (4) increase in premium and failure of "the undersigned" to pay the increase within sixty days after notification, the entire balance of the note shall become due and payable at "your" election. Then follows this sentence: "You are irrevocably authorized, without any notice to the undersigned (1) to cause or negotiate with the insured for cancellation of any or all such policies (irrespective of whether or not cancellation by the undersigned as a matter of right is provided for therein) from or after at your election the occurrence of any such default or event, or the time of the cancellation of any such policies as to which you have thereafter made or requested reinstatement upon the faith of a check or draft tendered by or on behalf of the undersigned which is dishonored. Your written statement as to any of these matters shall be sufficient authority for the insurer to so cancel any such policies." There is a further provision that rights conferred upon "you" shall inure to the benefit of "your" assigns. This interesting document was signed on behalf of the insured on September 21, 1961.

On the same date, Copperstate, by Douglas, signed the following, which is printed at the bottom of the same piece of paper:

"(If this note is sold to the Del Mar Company, the following assignment must be executed)

### "ASSIGNMENT"

"In consideration of The Del Mar Company paying to the Insurance Companies the balance shown in the aforesaid Note, the undersigned, without recourse, hereby assigns the aforesaid Note to The Del Mar Company."

What makes the foregoing document so interesting is that The Del Mar Company is a wholly owned subsidiary of Fidelity and likewise has its office in Maryland, adjacent to the office of Fidelity. As the court found, Del Mar was used by Fidelity as an instrumentality for financing premiums. Apparently Del Mar did what the assignment above quoted indicates was expected of it, namely, paid the full premium to Fidelity. In Fidelity's opening brief counsel states: "Defendants' premium obligations under the insurance policy are not involved here. Those obligations were extinguished when defendants entered into the financ-

ing arrangement * * *. Defendants' obligations under the note are involved. * * *"

Thus it appears that a policy of insurance was issued by Fidelity for a period from August 22, 1961 to August 22, 1962 and that Fidelity received the full premium payment contracted for. Nevertheless, Fidelity brought this action, asserting that Del Mar, its wholly owned subsidiary, acting as agent for the insured, cancelled the policy for nonpayment of premium on March 16, 1962. To say the least, this is a curious form of agency. If Del Mar in fact in any way represented the interests of the insured, that fact has not been called to our attention. It would appear that its interests were entirely adverse to those of the insured. In exchange for the note, it had paid the premium to Fidelity and had taken as security a lien on the policy proceeds. That lien could be made effective (unless there were an accident resulting in a liability of Fidelity to the insured) only by cancelling the policy, so as to make available, to pay the note, unearned premium that Fidelity would otherwise have to return to the insured. So far as appears from the "Note," Del Mar would be able to keep all such moneys, up to the full amount of the note, even though the policy were cancelled. The insured's promise to pay the full amount is unqualified.

In fact, Del Mar acted as if it were the insurance company, and used the threat of cancellation as a means of collecting on the note. If it was anyone's agent, it was Fidelity's. It accepted late payments of the October 22, November 22 and December 22, 1961 installments and of the January 22, 1962 installment. When the February, 1962 payment was late, it sent out, as it had on the previous occasions, a notice headed, in capital letters: "DID YOU FORGET?". This notice then recites: "Our records indicate that your insurance premium payment has not been received. We do not wish to deprive you of your insurance protection, but to keep your policy (ies) in force, your payments must be in our hands on or before the date shown below, otherwise it (they) will be cancelled with-out further delinquent notice." In the case of the February 22, 1962 payment, this notice bears a "cancellation" date of March 14, 1962. The document at the bottom bears the name, The Del Mar Company, 119 Water St., Baltimore 3, Md. It will be noted that the notice does not refer to an installment due on the note. It refers to "your insurance premium payment." This notice was received by both Copperstate and the insured on March 6, 1962. The insured, through inadvertence, did not pay by March 14.

Under date of March 15, 1962, Del Mar mailed a printed form, which is headed: "NOTICE OF CANCELLATION" and appears to be addressed to "USF & G Co. Phoenix, Ariz." and to the insured and to Copperstate. It shows the policy number, and in small type at the bottom there is printed the following:

"Gentlemen:

"As previously advised, this Company holds the note of the above assured and an assignment and power of attorney authorizing this Company to cause cancellation of the above described policy (ies) on default in the payment of any installment due on said note, and to receive and receipt for all moneys due the assured under said policy (ies).

"Said assured is now in default in the payment of an installment due on said note and we therefore cancel the above described policy (ies) effective at the beginning hour specified in the policy (ies) on the date following the date of this letter, or on such later date (the minimum period in any event) as may be required by law and request you to pay this Company the return premium.

Respectfully yours,
THE DEL MAR COMPANY
R. F. Myers
Manager"

This was received March 19.

So far as appears, Fidelity did nothing. If it even made a notation on its books, the record does not show it. It did not communicate with the insured, or with its agent Copperstate. It did not even re-

spond to its instrumentality, Del Mar, which it now says, was its insured's agent. As we note later, it also calls Copperstate the agent of the insured, which we find a little odd in view of its written agency agreement with that company.

Upon receipt of this notice, the insured did just what one would expect. Their representative, Munson, phoned Copperstate, the only party with whom they had had any dealings about the policy. He talked to Smith, saying that the insured had to have insurance coverage, and asking what should be done to continue the insurance in force. Smith told him to make the February payment. Smith believed that this would continue the insurance in force, and intended to quell Munson's anxieties, thus dissuading him from getting other insurance. Munson at once sent a check for the premium to Del Mar. He relied on Smith's statement. Had he not, he would immediately have arranged for other insurance.

Del Mar received the payment on March 20. It did not, however, request that Fidelity reinstate the policy. Instead, on March 23 it addressed a letter to the insured, with copies to "Agent" and "Phoenix."[1] This, too, is a form letter. It reads:

"We acknowledge receipt of your remittance in the amount of $921.13 and we have credited it to your February installment.

"Regretfully, however, we cannot request the reinstatement of your policy (ies), because your March installment is now past due.

"If you will be good enough to let us have your additional remittance immediately in the amount of $921.13 in payment of your March installment, we shall be glad to request the reinstatement of your policy (ies)."

This letter was received by Copperstate on March 27.[2] The court did not find that the insured received it. The evidence indicates that they did not.

It is strenuously argued that the insured must have received it, and that the court was required to so find. We think not. Munson testified that he was in charge of insurance matters for the insured, and that he never received the letter. There is no testimony by anyone that it was ever mailed to the insured, not even by way of a description of Del Mar's regular course of business in mailing such letters.[3]

On April 5th, Smith told Munson that Del Mar had not received the March payment, and told Munson to send it in, which he did. On April 9th, Del Mar sent a printed form, entitled "Request for Reinstatement" to U.S. F & G Co., Phoenix, Arizona and to the insured and Copperstate. It identifies the policy, and has a statement at the bottom, in fine print (except for an inserted date) reading:

"Gentlemen:

Under date of Mar. 15, 1962, we canceled the above policy (ies). We are in receipt of remittance from the Assured and therefore request that you void our cancellation and reinstate the policy (ies).
Yours very truly,
THE DEL MAR COMPANY
R. F. Myers
Manager"

---

1. Presumably this means Fidelity's Phoenix office.

2. The court found that it was received by Copperstate on March 29. We think the difference immaterial.

3. In their answer to Fidelity's complaint, the insured admitted receipt of this letter on March 28. Thereafter, the parties stipulated that Copperstate received a copy of this letter on or about March

27. The stipulation continues: "The parties expressly make no stipulation as to whether said letter was mailed to or received by the defendants." The parties seem to have treated this stipulation as superseding the pleadings in this respect. So did the trial judge. So do we. Fidelity does not now rely on the answer as showing receipt by the insured. It argues that the insured's receipt of other communications requires a finding that they received this one. We do not agree.

Meanwhile, on March 30, an accident involving one of the insured occurred and Fidelity was notified. Another occurred April 7, and a third April 10. These stimulated Fidelity, and on April 13 its Phoenix office addressed a letter to the insured, which they received April 17. It reads:

"We have received notice from you regarding certain accidents that have occurred since March 17, 1962.

"Our records indicate that your insurance coverage terminated for failure to pay premium as of March 16, 1962 and was not reinstated.

"I am sending a copy of this letter to your agent, Copperstate Insurance Agency."

We find this document, like some of the others in this case, rather remarkable. It recites "failure to pay premiums." Yet Fidelity had been paid in full, and Del Mar had received and retained the insured's late payments. It refers to Copperstate as "your" agent. Yet Copperstate was a Fidelity agent.

Del Mar, too, got busy, and wrote to the insured, with copies to "agent" and "Phoenix." This was done on April 16, and was, for the first time, not a printed form. It reads:

"We are today advised by the Phoenix office of the United States Fidelity and Guaranty Company that they have declined to honor our request dated April 9, 1962 for reinstatement of your captioned policy; therefore, this policy remains canceled in accordance with our Notice of Cancellation dated March 15, 1962.

"Just as soon as we receive the return premium from the insurance company we shall make any adjustment that may be due you."

At the bottom of the copy that went to the Phoenix office of Fidelity, appears: "William H. Hall Casualty Dept. *We now have a balance of $1842.26 for this policy."

Ironically, on April 24, Del Mar again wrote to the insured, acknowledging receipt of $921.13 (the March payment). It stated that this has been credited to the insured's account, "reducing the balance to $921.13." The letter continues:

"On April 16, we were advised by the insurance company that they had declined to honor our request for reinstatement of your policy dated April 9, and that the policy would remain canceled in accordance with our Notice of Cancellation dated March 15th.

"Just as soon as we receive the return premium from the insurance company we will make any adjustment that may be due you through your agent's office."

We note again the reference to "your" agent, and the lack of claim by Del Mar to be the insured's agent. It is still the creditor, keeping its pound of flesh.

■ The insured must have felt as if they had been conducted "Through the Looking Glass." We think they were; so apparently, did the trial court. It found and concluded, among other things, (1) that the policy was not cancelled before April 16, 1962; (2) that Copperstate was within its apparent authority in telling the insured to do what they did; (3) that Fidelity is estopped to assert cancellation before April 16; (4) that Fidelity, not the insured, cancelled, and on April 16, not March 16. It gave judgment accordingly.

■ We think that these findings are fully supported by the record.[4] Fidelity had been paid. What right did it have to cancel? To call Del Mar an agent of the insured, on the basis of the words used in the invoice, is sheer fantasy. If it was in fact a separate entity from Fidelity, as Fidelity says it was, it was a creditor of the insured, not their agent. It was Fidelity's instrumentality. If the insured read the policy, and especially the paragraph dealing with cancellation, we think that they would expect to hear from

---

4. We need not consider other findings, stating other grounds, for the decision.

Fidelity before a cancellation would be effective. The policy provides:

> "A. CANCELLATION. This policy may be canceled by the Named Insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be canceled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice."

This paragraph speaks of cancellation "by the Named Insured," or by the Company (Fidelity), not by Del Mar.

■ The insured did not hear from Fidelity until April 16, when they received Fidelity's letter of April 13. Giving full weight to the right given to Del Mar by the "Note" to "cause or negotiate with the insurance company for cancellation," and to the statement in the "Note" that Del Mar's written statement would be sufficient authority for the insurer to cancel, the insured could still expect that, before cancellation would be effective, the insurer, Fidelity, should act. Yet the testimony is that it did nothing at all.

The use of the form letters and notices may explain why Fidelity did nothing upon receipt of the "Notice of Cancellation." It apparently was waiting to see whether Del Mar's collection efforts would succeed. If they did, Fidelity, by still doing nothing, would have "reinstated" the policy. Thus, so far as the insured are concerned, they would think that they had coverage throughout. Fidelity, however, would be in the happy position of being able to claim, even though its instrumentality had accepted further payments, and kept them, that there was an interval in which there was no coverage. Obviously, it would do this only when, as here, an accident occurred during that interval. The conclusion seems inescapable that Fidelity's purpose in resorting, through Del Mar, to this "cancellation" device, was not to terminate the insurance, but to collect payments.

■■ Against a background of repeated acceptance of late payments by Del Mar, the insured could assume that Del Mar, as Fidelity's instrumentality, would accept another late payment. Receipt of a copy of the "Notice of Cancellation" did cause them concern. But their belief was reinforced or re-established, and their concern assuaged, by Copperstate, through Smith. It was with Copperstate that the insured dealt. It was the signature of the policy by Copperstate's president that was required to make the policy binding. It was Copperstate that delivered the policy. It was Copperstate with whom Fidelity wanted them to deal. Where but to Copperstate would any reasonable person go upon receipt of the Del Mar notice of "cancellation"? What could be more reasonable than reliance by the insured upon Copperstate? What difference should it make, under these circumstances, whether Copperstate was a "general agent"? How were the insured to know? By asking Copperstate? Copperstate thought it had the authority. Copperstate believed that payment of the premium would keep the policy in force, and the court so found. If the insured had asked Copperstate, and if they had received that answer, must they then ask Fidelity, which never dealt with them directly, and from which they had heard nothing, whether its agent was lying, in a case in which Fidelity required that they deal through Copperstate? Under these circumstances, we think that Fidelity conferred upon Copperstate apparent authority to do just what it did—advise the insured as to how to keep the coverage.

To say, as appellant does, that the insured have not been prejudiced by their reliance upon Smith, or upon Del Mar's retention of their payments, because no loss occurred until after Copperstate received Del Mar's March 23, 1962 letter, is to trifle with the facts. It was not

until after an accident had occurred that the insured were told about the letter, and then Smith told them to make the March payment. This they did, and Del Mar kept the money. The insured twice paid an additional $921.13 in reliance upon Smith; they had refrained from getting other coverage in reliance on Smith; they had paid, before March 27, $7,557.12 out of $10,320.51 for coverage. To assert that, by loss of the coverage, they lost nothing, does not lie in the mouth of Fidelity, which had been paid the full premium for just that coverage. In other contexts, we suspect that Fidelity would assert that the coverage was worth every cent of the premium, even though no covered accident ever occurred.

 We think that, in the context of today, when a businessman is required by the insurance company to deal with its agent, the businessman, when problems about the policy arise, is entitled to rely and act upon what the agent tells him. In such a case, if the agent's authority is limited, the burden should be upon him, and on the insurer, to tell the insured, not upon the insured to inquire. We think, too, that the insurance company cannot escape its responsibilities to its insured, for which it has been paid, by the device of creating a financing company and purporting to make that company the agent of the insured, with authority to cancel his policy, even though this be under the guise of affording the insured a "convenience." We think that we have here, in modern context, a classic case for application of the doctrine of estoppel.[5] And we think that the Supreme Court of Arizona would so hold.

 In Arizona, the doctrine of estoppel is, of course, well established. (E. g., Holmes v. Graves, 1957, 83 Ariz. 174, 318 P.2d 354; Heckman v. Harris, 1948, 66 Ariz. 360, 188 P.2d 991; Onekama Realty Co. v. Carothers, 1942, 59 Ariz. 416, 129 P.2d 918.) The Arizona court

has employed the doctrine to prevent forfeiture of insurance policies. (See Occidental Life Insurance Company v. Jacobson, 1914, 15 Ariz. 242, 137 P. 869). The elements of the doctrine, as stated in Holmes, are (1) acts inconsistent with the claim afterward relied on, (2) action by the adverse party on the faith of such conduct, and (3) injury to that party resulting from the repudiation of such conduct.

Here, some of the acts inconsistent with the claim of cancellation are those of Fidelity's agent, Copperstate, through its officer, Smith. We think that Smith's statements could have misled (and, as the court found, did mislead) the insured into a belief that, when they paid the late premiums, the policy would continue in effect. We think that in this case the court could find, as it did, that Smith had apparent authority to tell the insured what he told them. We assume, as Fidelity contends, that Copperstate was not a general agent, and that an agent who is not a general agent does not have actual authority to "re-instate" a policy. We think, however, for reasons already stated, that in this case, in connection with this policy, and considering Fidelity's method of requiring that the insured deal with its agent, apparent authority existed. (See generally 16 Appleman, Insurance Law and Practice § 8698, at 120.)

We think, too, that Fidelity is estopped to rely upon the "cancellation" here by the conduct of its instrumentality, Del Mar, in accepting late payment of the February premium and inviting and retaining late payment of the March premium despite the fact that Del Mar had previously given notice that the policy had been "cancelled." As we have noted, Fidelity itself gave no notice to the insured that the policy was cancelled, though the policy seems to require it. Nor, so far as the record shows, did Fidelity take any steps to terminate its

---

5. At the trial, counsel for the insured stated that Del Mar had the right to cause cancellation, and that the premium for February was sent in after Del Mar mailed notice that it elected to exercise its cancellation rights. He relied entirely upon estoppel. We therefore confine ourselves to estoppel.

relationship with the insured until after it had notice of the accidents. We think the insured, relying on this conduct, could reasonably conclude that Fidelity intended to maintain the policy in force and that timeliness of payment was not essential to insure continuing coverage.

The insured "acted" in two ways. They paid the installments as Smith told them to do, and as Del Mar invited them to do. More important, they refrained from getting other coverage. In doing so, they relied on Fidelity's agent and its instrumentality. And they certainly were injured. The elements of estoppel are all present.

Affirmed.