PACKARD BELL ELECTRONICS CORP., Plaintiff-Appellee,

v.

Elliott ETS–HOKIN, Defendant-Appellant.

No. 74–1107.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1974.

Decided Jan. 16, 1975.

S. Joseph Formusa, Chicago, Ill., for defendant-appellant.

Reuben L. Hedlund, Thomas F. Gardner, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, PELL and TONE, Circuit Judges.

PELL, Circuit Judge.

The plaintiff-appellee Packard Bell Electronics Corporation (Packard Bell) brought this action for breach of contract against its former franchise wholesale distributor, Elliott Ets-Hokin. In its complaint, Packard Bell alleged two alternative theories: (1) that payment was due on two promissory notes executed by Ets-Hokin in favor of Packard Bell (Count I) and, (2) that Ets-Hokin was liable for the sum under a Continuing Guaranty which he had signed (Count II). Jurisdiction is based on diversity of citizenship.[1]

Following a bench trial, the district court, finding that the promissory notes in question had been paid, dismissed Count I. The court, however, found in favor of Packard Bell on Count II on the ground that Ets-Hokin was equitably estopped from denying his liability under the guaranty. Judgment was entered against Ets-Hokin in the amount of $379,599.55 plus plaintiff's costs and attorney's fees. Ets-Hokin appeals from the district court's decision on Count II.

The principal issue on appeal is whether the doctrine of equitable estoppel was properly applied in this case.

I

On February 24, 1961, the plaintiff and the defendant entered into a franchise agreement, pursuant to which the Elliott Company, a sole proprietorship, became a wholesale distributor of the products of Packard Bell, a California corporation. The Elliott Company was to operate in specified counties of Arizona. On the same date that the distributor agreement was signed, Elliott Ets-Hokin and his then wife, Michele Ets-Hokin, executed a Continuing Guaranty, whereby they jointly and severally guaranteed to pay to Packard Bell "any and all indebtedness of Elliott Ets-Hokin dba The Elliott Company." Elliott Ets-Hokin was, by this instrument, merely guaranteeing his own obligation and, therefore, the principal significance of the document was to add Michele Ets-Hokin as obligor although the Guaranty did provide for collection costs and attorney's fees.

Renewal distributor agreements, substantially identical to the original agreement, were subsequently executed by the parties. The last such agreement was executed in 1964 and provided for automatic extension from year to year absent written notice of termination prior to the end of any annual year. In the 1964 agreement, the distributor was identified as "Elliott Ets Hokin dba The Elliott Company."

In August 1968, Ets-Hokin caused an Arizona corporation to be formed to take

1. Packard Bell is a California corporation and Elliott Ets-Hokin is a citizen of Illinois.

over and carry on the business of the sole proprietorship. The corporation, operating under the name "Elliott Distributing Company, Inc.," commenced doing business on January 1, 1969. In March 1969, a second corporation, Elliott Distributing Company of Tucson, Inc., was established by Ets-Hokin to take over and carry on the business of the distributorship in the Tucson area. The first-formed corporation thereafter handled only the business in the Phoenix area.[2] The evidence clearly indicated that Packard Bell, through some of its agents and employees, knew of both Ets-Hokin's plans to incorporate and the actual incorporations.

No franchise distributor agreement was ever entered into between Packard Bell and either the Phoenix corporation or the Tucson corporation.

Packard Bell maintained several accounts for the distributorship. Merchandise was shipped by Packard Bell and billed to an "open" account upon which no interest was charged. A "note account," upon which interest was charged, was established for the defendant as a means of handling overdue balances.[3] When payment was in arrears, Packard Bell would periodically clear the open accounts by means of bookkeeping entries: Packard Bell would credit the open accounts and would debit, by a corresponding amount, the note account. Generally Packard Bell obtained a signed personal demand note from Ets-Hokin for the debits in the note account. Some transfers, however, were made to the note account without Ets-Hokin having signed a personal note and ultimately he declined to sign further personal notes although under pressure to do so by the threat that the distributorships would be terminated.

At the close of business of the sole proprietorship at the end of 1968, the distributorship was indebted to Packard Bell in the amount of $929,237, which included $212,000 then outstanding on the note account. The notes sued upon in Count I of this litigation were two personal notes signed by Ets-Hokin in January and March of 1969 to cover amounts in the accounts due from the sole proprietorship. These notes totalled $640,000 and were the last personal notes signed by Ets-Hokin.

When the Elliott Distributing Company, Inc. commenced the business of the distributorship in January 1969, the corporation did not disavow the debts of the sole proprietorship. Rather, it received statements of this indebtedness from Packard Bell and made payments toward the accounts. Subsequent to the incorporations, Packard Bell sold approximately $2,000,000's worth of merchandise to the corporations, with over one million dollars being transferred to the note accounts, despite the fact that Ets-Hokin did not sign additional personal notes. In late 1970, Security Agreements and Financing Statements on behalf of both corporations were signed and delivered to Packard Bell.

In July 1971, the distributorships were indebted to Packard Bell in the amount of $583,159.29. Due to repossessions and collections by Packard Bell, the debt was reduced by the district court to $379,599.55.[4] This amount, plus costs and attorney's fees, was awarded below to Packard Bell.

## II

Packard Bell claimed (in Count II of its complaint) that Ets-Hokin was liable for this indebtedness under the Continuing Guaranty, which the defendant had signed in 1961. As the district court noted, and as Packard Bell concedes, this guaranty related solely to the indebtedness incurred by the sole proprietorship and does not by its terms extend to the debts of the corporations. The district court, however, agreed with Packard

---

2. During 1967, the defendant's distributorship territory had been expanded to include the entire state of Arizona.

3. When the second corporation was formed, the "note account" was divided into two accounts.

4. Packard Bell does not challenge this reduction.

Bell that the doctrine of equitable estoppel applied to prevent Ets-Hokin from raising the incorporation of the distributorship to defeat the operation of the guaranty.

■ Equitable estoppel arises "only when one has so acted as to mislead another and the one thus misled has relied upon the action of the inducing party to his prejudice." Lebold v. Inland Steel Co., 125 F.2d 369, 375 (7th Cir. 1941), cert. denied, 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749. Reliance is an essential element of equitable estoppel and absent reliance, the doctrine does not apply. See Lebold v. Inland Steel Co., *supra*; United States Fidelity & Guaranty Co. v. Stewart's Downtown Motors, 336 F.2d 549, 556 (9th Cir. 1964); Safeco Insurance Co. v. Franklin, 185 F.Supp. 499, 501 (N.D.Cal.1960).[5]

In the present case, agents of Packard Bell not only knew of the incorporation of the distributorship, but they had discussed the possibility of incorporation with the defendant prior to the establishment of the corporations and had given Ets-Hokin permission to go ahead with the incorporation. Packard Bell's treasurer admitted that during his discussions with Ets-Hokin concerning the incorporation, the guaranty was not mentioned. After the corporations were formed, Packard Bell changed its accounting books to reflect the incorporation of the distributorship.

We are not presented here with the case of a guileless and unsophisticated investor being overreached or affirmatively misled. The correspondence although often couched in informal terms insofar as the relationship of the parties was concerned reflected that Packard Bell was not only an aggressive merchandiser[6] but was not a lethargic collector.

Yet not until approximately two years after the first corporation commenced operations did Packard Bell assert that Ets-Hokin remained liable upon the instrument signed some ten years earlier which by its explicit terms pertained only to the obligations of the individual proprietorship. Indeed from the outset and throughout the decade or so of this business relationship the guaranty was of equivocal significance insofar as Ets-Hokin was concerned. It appears rather obvious that the main purpose of the original guaranty was to secure the additional backing of Ets-Hokin's spouse, a not uncommon procedure amongst lending institutions and others advancing credit to individuals. The judgment creditor of the husband not infrequently finds that he is unable to satisfy his judgment because the property, the appearance of which being that on which he was relying is in the wife's name or his held in a joint tenancy arrangement. Insofar as principal amounts were concerned no purpose was served in having Ets-Hokin as a signatory on the guaranty as he was already fully obligated for the payment of all merchandise purchased as he was the sole proprietor. It is true that this pot-boiler form, although it had provisions having no applicability to the Ets-Hokin sole proprietorship situation, did purport to waive certain rights customarily enjoyed by debtors and did provide for the payment of attorney's fees and collection costs. Nevertheless, it would appear that the significance of the guaranty was rather minimal insofar as Ets-Hokin was concerned.

When the first corporation commenced business and during the period prior

---

**5.** The guaranty was executed in California and the distributorship operated principally in Arizona. There is, however, no conflict of laws problem since the doctrine of equitable estoppel is well established in both California and Arizona. See United States Fidelity & Guaranty Co. v. Stewart's Downtown Motors, *supra*; Safeco Ins. Co. v. Franklin, *supra*.

**6.** There was testimony that Packard Bell under threat of franchise termination overloaded the distributorships which may well have had a bearing on the negative financial picture which developed. Inasmuch as we are of the opinion that Packard Bell failed to prove an essential element to establish equitable estoppel we need not decide whether the coercive overloading occurred or what the legal effect would be if it did.

thereto when Packard Bell consented to the change of business form there was never any indication that Packard Bell either was wanting a new individual guaranty of the corporation indebtedness or was relying on the seven year old instrument. Instead Packard Bell went by another route. Within fifteen days after the corporation commenced business, Packard Bell had secured from Ets-Hokin a promissory note for $300,000.00 and two months later a second note for $340,000.00. These notes not only provided for attorney's fees but also for interest at seven percent. The guaranty did not include an interest provision. The principal amounts of the notes were approximately equivalent in March 1969 to the accounts of the distributorship owing to Packard Bell.

Inquiries from Packard Bell as to Ets-Hokin's personal financial condition, although not developing for nearly two years after the execution of the notes, are readily understandable, not because of the ancient guaranty but because of the current promissory notes. Nevertheless at about the time Packard Bell was evincing interest in Ets-Hokin's financial condition it took other steps to protect its creditor's position. In October, 1970, writing Ets-Hokin's attorney "[w]e have been financing both of the subject corporations and to justify our large line of credit and to permit us to continue to make shipments of new merchandise as required and work with Mr. Ets-Hokin on other arrangement which will be of benefit to both of us," Packard Bell asked that "all-inclusive" Security Agreements be executed. These were in due course executed and the following

year Packard Bell terminated the distributorships apparently feeling secure in having promissory individual notes of $640,000 plus a tight lien interest on all merchandise. The repossessions pursuant to the Security Agreements resulted in a net balance due of less than $400,000.

We also note the existence of a further reason for Packard Bell's interest in Ets-Hokin's financial condition, even though belated in developing, in that he was considered by Packard Bell to be the principal of the two corporations notwithstanding another stockholder in each and the receipt of an inheritance from his father would have enabled him, if he had so desired, to put additional capital into corporation businesses. A few months before the termination a Packard Bell official met with Ets-Hokin and wanted a commitment or promise that Ets-Hokin would invest an additional $75,000 in the businesses.

Ets-Hokin moved from Arizona to Chicago in late 1969 and had nothing to do with the day-by-day operations of the distributorships thereafter. The record is barren of support that Packard Bell was relying on Ets-Hokin's personal financial responsibility in commencing and continuing to do business with the corporations.

■ Further, as we have noted, Packard Bell had been extending a large line of credit to the corporations for almost two years prior to the inquiry into Ets-Hokin's personal finances and the reference to the Continuing Guaranty. Since there is no evidence that Packard Bell relied on the guaranty in extending this credit to the corporations, equitable estoppel cannot apply.[7] See United States

---

7. Packard Bell contends that evidence of its reliance on the guaranty can be found in certain correspondence sent to Ets-Hokin which referred to "your accounts." We find this argument unpersuasive. The evidence indicated that Packard Bell also sent letters addressed to the corporations and to the managers of the corporations and that these letters similarly referred to "your accounts." Moreover, most of the correspondence upon which Packard Bell relies was written after credit had already been extended to the corpora-

tions. That Packard Bell failed to use language with lawyer-like exactitude in its correspondence and memoranda, even in that which had legal significance, is reflected in the letter of notification of intent to repossess pursuant to the Security Agreement: "Pursuant to paragraph 14 of Packard Bell Electronics Corporation's Distributor Franchise Agreement executed by Elliott Distributing Company, Inc. on February 17, 1964, . . ." Of course, the corporation did not come into existence until four years later. It is clear,

v. Aetna Cas. & Sur. Co., 480 F.2d 1095, 1099–1100 (8th Cir. 1973); Lebold v. Inland Steel Co., *supra*; General Motors Acceptance Corp. v. Gandy, 200 Cal. 284, 253 P. 137, 142 (1927).

The district court, in finding that equitable estoppel did apply, pointed out that Ets-Hokin failed to terminate the guaranty.[8] The guaranty, by its language, however, clearly did not cover the indebtedness of the distributorship after it had been incorporated. In light of this, Packard Bell's knowledge of the incorporation, and its failure even to mention the guaranty until almost two years after the incorporation, we do not consider Ets-Hokin's failure formally to terminate the guaranty to be determinative.

The district court also placed reliance on the fact that no distributorship agreement was ever executed in the corporate names. Since the original distributorship agreement and the Continuing Guaranty were "interrelated" in that they were executed on the same date, the district court concluded that "the failure to enter into a new distributorship agreement executed by the corporation takes on added weight and significance in determining whether the guaranty remained operable." We cannot agree. Packard Bell admittedly knew of the incorporation of the distributorship. We would be elevating form over substance to hold that the guaranty continued to operate until the parties "formal-ized" in the distributorship agreement a change which Packard Bell knew had occurred.

Our decision here is not contrary to this court's opinion in Kingsberry Homes v. Corey, 457 F.2d 181 (7th Cir. 1972). In *Kingsberry*, the doctrine of equitable estoppel was applied where, in order to obtain an open account status, the members of a partnership executed a guaranty but shortly thereafter incorporated their business. This court noted in *Kingsberry* that the parties intended "to exchange an open account status in return for a pledge of individual responsibility"; that the incorporation occurred only eight months after the guaranty was executed; that the defendant failed to give formal notice of incorporation and used order forms which did not indicate incorporation; and that the corporate name was almost identical to the partnership name. 457 F.2d at 183. In contrast, in the present case, there was no concealment of the existence of the corporations, the incorporation occurred after eight years of continuous and close business dealings between the parties[9]; and, as previously noted, there is no evidence that Packard Bell relied on the guaranty in extending credit to the corporations.[10]

### III

Packard Bell contends that the judgment entered below can be supported on the alternative theory (contained in

---

however, that the billing department was not equally casual in its designations and the original corporation was, and eventually both corporations were, recognized as the de facto and de jure distributor, not Ets-Hokin personally.

**8.** The Continuing Guaranty provided:

"This Guaranty shall not apply to any indebtedness created after receipt by Packard Bell of written notice of its revocation as to future transactions."

Ets-Hokin testified at the trial that he told agents of Packard Bell in September 1970 that he, Ets-Hokin, was not responsible for the corporate debts. The district court discredited this testimony and we accept the district court's finding in this respect and assume that Ets-Hokin did not disclaim the guaranty.

**9.** The corporations were not mere customers of Packard Bell but were the franchised distributors for the entire state of Arizona. The evidence indicated that Packard Bell, as franchisor, closely scrutinized the affairs of the corporations.

**10.** D. N. & E. Walter & Co. v. Zuckerman, 214 Cal. 418, 6 P.2d 251 (1931), is also distinguishable from the case before us. In *Zuckerman*, a guarantor was held liable on a guaranty which related to the debts of a sole proprietorship where a later formed corporation was found to be the alter ego of the sole proprietor and the only notice of the incorporation given to the plaintiff was, apparently, a notation on certain checks. Here, there is no question of notice of incorporation and there is no claim that the corporations were the alter egos of Ets-Hokin.

Count I of its complaint) that payment was due on the two personal notes signed by Ets-Hokin in 1969.

As a preliminary matter we must consider Ets-Hokin's first answer to this contention, i. e., that the issue of Count I, the payment of the notes is not before this court since Packard Bell did not cross appeal. Unfortunately for a full consideration of the validity of this argument, it was first presented in the appellant's reply brief and then was only supported by citation to the rather unarguable proposition that filing of a notice of appeal is jurisdictional. We, of course, do not have a brief on this issue from the appellee since the issue had not been raised when the answer brief of the appellee was filed.

In looking at the two Counts of the complaint we note each seeks the identical amount of recovery and obviously this was the net amount still owing at the cessation of the distributorships in Arizona with which Ets-Hokin was connected. Judge Magruder dealt with an analogous situation in Cochran v. M & M Transportation Co., 110 F.2d 519 (1st Cir. 1940). In that case, the plaintiff had "four strings" to his bow as contrasted to the two counts here. The court pointed out that having prevailed upon one count below the appellee could not have appealed the judgment based upon that part of the verdict since he had received the full relief to which he would have been entitled on any of the counts. However, the present case departs from *Cochran* in that final judgment was entered below in the present case as to both counts whereas it had not been in *Cochran* as to the three counts on which the appellee did not prevail. The situation confronting us may well fall within the ambit of Judge Magruder's words:

"The situation is different where a judgment grants a litigant only part of the relief sought, and denies the rest. In such a case the party is aggrieved in part by the judgment and may appeal or cross-appeal. If he fails to do so he can be heard only in support of the judgment as rendered;

such judgment becomes res judicata as to the issues decided against him. Alexander v. Cosden Co., 1934, 290 U.S. 484, 487, 54 S.Ct. 292, 78 L.Ed. 452; United States v. Hickey, 17 Wall. 9, 21 L.Ed. 559." 110 F.2d at 523.

Packard Bell, possibly cognizant of the difficulties of its procedural position in challenging the court's ruling on Count I, argues that they were entitled to recover on the notes and that this is a basis for affirming the judgment which was based on Count II apparently on the well established doctrine:

"The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court. Compare Langnes v. Green, 282 U.S. 531, 538 [51 S.Ct. 243, 246, 75 L.Ed. 520], with Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 567–568 [51 S.Ct. 248, 252, 75 L.Ed. 544]. As the Court said in United States v. American Ry. Express Co., 265 U.S. 425, 435–436 [44 S.Ct. 560, 564, 68 L.Ed. 1087]: '[I]t is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.'" Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156–1157, 25 L.Ed.2d 491 (1970).

■ We are inclined to the view that the appellee is actually asking us to review an extensive record and to reverse in the absence of notice of appeal a judgment based upon Count I. We have set forth enough of this procedural issue to demonstrate that it is far from being free of complexity. In the absence of any sort of helpful analysis of the issue from the parties and in view of the fact that we find no merit in the claim of error as to Count I we will assume *arguendo* that the matter is before us.

The district court ruled against Packard Bell on Count I on the ground that

neither it nor Ets-Hokin had designated to which particular debt payments were to be applied and that "[a]bsent such evidence, the law of Arizona and California called for application of each payment to the oldest obligation in point of time." Under this rule, as Packard Bell concedes, the personal notes in question have been paid.

■ Packard Bell argues here, as it did in the district court, that the evidence indicated that the plaintiff had in fact chosen to apply payments in a manner which left the personal notes of Ets-Hokin unpaid. The district court's finding of fact that no designation had been made by Packard Bell is not clearly erroneous and, therefore, the district court's decision on Count I will not be disturbed. Rule 52, Fed.R.Civ.P.

IV

■ Finally, Packard Bell argues that if the personal notes were paid, they were paid from corporate funds and, therefore, Ets-Hokin is liable to Packard Bell, as a creditor of the corporations, for the corporations' debts to the extent of his use of corporate funds. We find this argument unpersuasive. As the district court noted, "the evidence indicates that the corporations assumed the note account indebtedness and made payments towards those accounts which was credited to the corporations by Packard Bell." Packard Bell itself regarded the notes as part of the debt of the distributorship and included them as such in its own accounting system.

In conclusion, we hold that equitable estoppel cannot be applied in this case and that, therefore, the incorporation of the distributorship bars recovery on the basis of the Continuing Guaranty. We are, moreover, unpersuaded by the other alternative theories of recovery suggested by Packard Bell. The judgment of the district court is therefore reversed and remanded for the entry of judgment for the defendant.